**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OUT EAST ACCESSORIES INC.,

<em>Plaintiff</em>,

-against-

DYLAN GRACE and MARTHA NOLAN,

<em>Defendants</em>.

Civil Action No.: 22-cv-3101

**JURY TRIAL DEMANDED**

## COMPLAINT

Out East Accessories Inc. ("***Out East***," or the "***Company***," or the "***Plaintiff***"), by and through its undersigned counsel, as and for its Complaint herein against Defendants Dylan Grace ("***Grace***") and Martha Nolan ("***Nolan***" and together with Grace, the "***Defendants***"), respectfully alleges and represents to this Court as follows:

### NATURE OF THE CASE

1.     Defendants Dylan Grace and Martha Nolan are two former employees of Out East, a company that specializes in the sale of its own branded sunglasses.  Both of these former employees were terminated by Out East for cause in November 2021.

2.     In the weeks leading up to their termination and for months thereafter, Grace and Nolan ransacked Out East, stole all of its assets, and essentially destroyed the Company. Specifically, among other things, both Grace and Nolan:

(i)     stole the $34,000 remaining in Out East's bank account;

(ii)    stole all of Out East's eyewear inventory and sold or gifted the eyewear without authorization, to enrich themselves at a total loss to the Company;

(iii)    deleted all of Out East's books and records, digital assets, and proprietary business and financial information from the Company's cloud server;

(iv)    locked out Company management from their Out East email accounts, preventing them from running the Company and responding to messages from partners, customers, and others;

(v)    locked out Company management from Out East social media platforms, ultimately destroying Out East's social media presence; and

(vi)    changed the bank accounts linked to brick-and-mortar stores, online platforms, and vendor accounts from Company bank accounts to bank accounts controlled by Grace and/or Nolan.

3.    This is an action, first and foremost, to recover from Defendants all intellectual property, cash, and inventory stolen by them and to prevent them from doing any further damage to Out East.  In addition, Out East is seeking damages against both Defendants for their egregious actions.  Based on company valuations prior to Defendants' actions, Out East has suffered millions of dollars in damages, in a specific amount to be determined at trial.

4.    Out East reserves the right to add additional defendants to this action, including without limitation the law firm that assisted Defendants with their theft of Company property.

**PARTIES**

5.    Plaintiff Out East Accessories Inc. is a corporation formed under the laws of Delaware, with a principal place of business in the Borough of Manhattan, New York City, New York.

6.    Upon information and belief, defendant Dylan Grace is a citizen of The Republic of Ireland residing in the Borough of Manhattan, New York City, New York.

2

7.      Upon information and belief, defendant Martha Nolan is a citizen of The Republic of Ireland residing in the Borough of Manhattan, New York City, New York.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as a portion of the relief sought arises from Defendants' violation of the Computer Fraud and Abuse Act codified in 18 U.S.C. § 1030.

9.      This Court has personal jurisdiction over both Defendants under Fed. R. Civ. P. 4, because both Grace and Nolan reside in New York State and are therefore subject to the courts of general jurisdiction in New York State.

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Defendants reside in this District, and a substantial part of the events or omissions on which the claims asserted herein are based occurred in this District.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A.      <u>Jeremy Valeda's Idea for a Sunglasses Company</u>**

11.     Out East is the brainchild of Jeremy Valeda ("***Valeda***"), the founder, chairman, president, and chief executive officer of the Company.  Valeda's interest in eyewear goes back to 2013 during his days at Harvard Business School where he focused his studies on the consumer goods sector, and in particular, eyewear.

12.     Back in 2018, Valeda pitched his idea of creating an eyewear company to a venture capitalist who had invested in eyewear companies, who agreed to be an advisor to Out East. Following that pitch and subsequent meetings, Valeda spent much time and effort learning about eyewear margins and ultimately developed a business case, which focused on sunglasses with a replacement policy for lost or destroyed glasses at a *de minimis* cost to the customer.

13.     Valeda developed the replacement program concept based on an umbrella company's program he learned about, which allowed purchasers of umbrellas to purchase a new umbrella at a substantially discounted rate in the event of loss.

14.     Also in 2018, Valeda identified a gap in the market for a Hamptons-themed eyewear brand and noted the shortage of luxury eyewear stores in an area of Montauk.

15.     Throughout 2019, Valeda attended various meetings to create and implement his business case for a new and unique sunglasses company.  For instance, on November 11, 2019, Valeda met with Tennador Sanderson and Hikmete Morina at the World Trade Center to discuss creating a "Hamptons"-themed sunglasses brand with a hallmark being the replacement program discussed above.  At that meeting, Valeda discussed several name options for his company, such as Halyard, Hampton Sunglasses, Out East, and Montauk Eyewear.

16.     In December 2019, Valeda and Tennador Sanderson began exploring potential manufacturers for the sunglasses.

17.     In March 2020, Valeda set up meetings with manufacturers Ira Zuckerman in Portland Oregon, and Prad Mohanty, a Harvard Business School alumni helping Out East with technology issues and the replacement program.  During those meetings, Valeda discussed margins on eyewear and the overall business concept of a Hamptons-themed eyewear company with a replacement program.

18.     In June 2020, Michael Roth, now head of sales for Out East, met Valeda at a sharehouse in Montauk, New York.  At the meeting, Roth had on his person a broken pair of Tom Ford® sunglasses which he purchased at a store in the Hamptons.  Roth discussed with Valeda how the store where Roth purchased the sunglasses refused to replace the broken pair.  During the discussion, Valeda stated to Roth that these sunglasses cost nothing to make and Valeda further

stated that he loses two to three pairs of sunglasses per year, and that is the reason he wanted to start a sunglasses business.  Michael Roth expressed his interest in the concept and in helping to create the business.

**B.    Jeremy Valeda Meets Defendants**

19.    In June 2020, Valeda met with Michael Roth and Defendant Dylan Grace at a sharehouse in Montauk, New York.  During that meeting, Valeda discussed his business concept and his need to hire key people to help get the Company off the ground.  Grace had expressed wanting to leave the hospitality industry.

20.    The following month, July 2020, Dylan Grace introduced his friend, Defendant Martha Nolan, to Valeda.

21.    In July 2020, Valeda created an advisory board of six experts in the eyewear, startup, and advisory communities to help guide and advise him and his potential staff.

22.    Subsequently, Valeda offered Defendants Grace and Nolan, as well as Michael Roth, Prad Mohanty, and Erika Derf, positions with the Company that he was in the process of creating.  Michael Roth was named Head of Sales, Prad Mohanty was named Chief Technology Officer, and Erika Deft took an all-purpose contract position.  Defendant Grace was given a role in operations and Defendant Nolan was placed in charge of marketing.  Grace and Nolan each were paid a wage of $2,500 per month.

**C.    Out East's Creation**

23.    In August 2020, Valeda chose the name Out East Accessories Inc. for the Company and developed an investment deck with the help of Lina Bustos.  Defendant Grace suggested the Company be called "Foakl," an acronym for "First of a kind lenses."  Valeda responded that he

already told his friends who wanted to invest that the Company would be called "Out East," a name developed by Valeda prior to meeting Grace.

24.     The investment deck listed Valeda as the sole founder of the Company.  Valeda funded expenses on his personal credit card and began to raise money and assemble a team to execute his vision for a disruptive eyewear company.

25.      In September 2020, Valeda incorporated the Company in Delaware with Valeda being the sole owner of the Company's shares and being its sole officer.  Grace and Nolan each continued to be paid $2,500 per month.

26.     In October 2020, after corporate formation of the Company, both Grace and Nolan indicated that they wanted to offer their friends and family the opportunity to invest in the Company.  According to Grace and Nolan, they wanted to bring in "friends and family" money to help fund their salaries.  Grace and Nolan also indicated to Valeda that they believed people would benefit from investing in Out East.  Valeda agreed, but capped any "friends and family" investments raised at $5,000 per investor.

27.     Meanwhile, since July 2020, Valeda had been working full time on assembling the notes, concepts, advisors, and potential employees needed to launch the Company.  To be clear, Grace and Nolan did not raise or refer any money before the Company was incorporated or invest any of their own money in the Company.  While both indicated to Valeda that they wanted meaningful roles with the Company, they were each pursuing other interests, including working at other jobs and attending school.  The Company considered Grace and Nolan contract employees in a touch-and-go situation.  That is, Valeda was unsure how much time they would be able to devote to the Company, or if they had the level of experience needed to fill their roles and help the Company meet its goals.

28.     In August 2020, using Valeda's personal credit card, the Company purchased the following domains, digital assets, and digital tools:

- Outeastaccessories.com

- Outeastsunglasses.com

- Outeasteyewear.com

- Office 365 Professional software

- Google Workspace (a premium, paid subscription version of Google Drive and other related Google products designed for business)

29.     By October 2020, Valeda was able to raise at least $65,000 of capital for the Company.  As noted, Grace and Nolan were told they could invite friends and family to invest a maximum of $5,000 per person as referrals, and that Valeda would speak to any such potential investors.  Valeda understood that the intent of Grace and Nolan's "friends and family" initiative was to help fund compensation for Grace and Nolan.  In some cases, Grace's and Nolan's "friends and family" investments were provided directly to their personal bank accounts.

30.     By October 2020, the following assets were created and purchased as Company assets (in addition to those set forth in paragraph 28 above), although they were purchased with Valeda's personal credit card:

- Shopify on outeasteyewear.com

- Instagram store as Out East Eyewear  (a store was linked on Instagram allowing users to view the posts to purchase the sunglasses displayed in the posts)

- Facebook store as Out East Eyewear

- Slack (company working space which was also tied to Shopify)

- Operational business emails for Company users

31.     Also in October 2020, the Company identified a manufacturer in China, created sixteen designs with the help of a contracted eyewear designer named Judge Khanna, and contracted a stylist advisor, Natalie Decleve.  The Company approved an order for 2,250 pairs of sunglasses, which was paid for and placed with the manufacturer.

32.     Around that same time, Grace and Nolan informed Valeda that they wanted to apply to become members of social clubs such as SoHo House and apply for Forbes' "30 under 30" list. To do so, they told Valeda that they wanted to use the term "co-founder" of Out East to improve their chances of admittance.  Valeda agreed, on the condition that Grace and Nolan could use this term as an outward-facing title for the sole purpose of bolstering their social applications.  Valeda made it abundantly clear that Grace and Nolan were not actual founders of the Company, because the Company had already been founded when they were introduced to Valeda, which Grace and Nolan had previously acknowledged.

33.     Based on these discussions, Valeda permitted Nolan to update a version of the Company's investment deck to indicate "co-founder" titles for Grace and Nolan for the sole purpose of their social applications, while in fact Valeda retained sole founder status.  Valeda's thought process at the time was that if it did not cost the Company anything, and it would benefit Nolan and Grace in those social areas, he would allow them to use those titles as an additional incentive for their help with the Company.  Valeda had offered the same incentive to Michael Roth and Prad Mohanty if certain goals were met.

34.     In December 2020, Out East opened a Company bank account and linked that account to the Company's online sales platforms.  The Company then officially launched, making Out East products available to customers through online sales platforms.

35.     Grace was given access to the Company bank account to monitor company spending and to make company purchases, with the stipulations that all expenditures were subject to Company approval and expenses over $500 required prior discussion and approval as an additional measure of control.

**D.     Defendants Seek to Change Compensation**

36.     In February 2021, both Grace and Nolan approached Valeda to discuss their compensation.  They were unhappy with their $2,500 per month arrangement and wanted to change their compensation.  Essentially, as the Company launched and grew, they were asking for an equity stake.  Grace and Nolan requested that they each be entitled to twenty percent (20%) of Company shares in exchange for their working at the Company.  Valeda informed them that he would consider it, but at a minimum, any equity grant would have to be on a fully diluted basis, because there would be no ability to raise additional money without dilution of starting equity positions that high.  Both Grace and Nolan agreed to the dilution concept and Valeda advised them that he would revert back to them regarding their equity ask.

**E.     The Company Offered Grace and Nolan Participation in an Equity Earn Plan**

37.     In March 2021, Jeffrey Aborn ("**_Aborn_**"), a friend of Valeda, committed $100,000 into the Company with the understanding that he would receive a board seat.  Aborn was brought in, not only to invest monies, but to provide managerial direction for the Company.  Valeda informed Aborn of Grace's and Nolan's desires to participate in an equity plan.  In the meantime, Valeda offered to continue to pay Grace and Nolan $2,500 monthly.  Valeda also offered to compensate Grace and Nolan on a commission structure, which they declined.

38.     Later that month and into early-April 2021, Valeda and Aborn proposed to Grace and Nolan an equity earn program under which equity of up to twenty percent (20%) each would

be earned and granted over a three (3) year vesting period.  After initially expressing interest in the program, Grace and Nolan agreed with Aborn on the vesting schedule during an in-person meeting.

**F.      Grace and Nolan Begin Abusing their Positions at Out East and Harming the Company**

39.      In late-April 2021, the Company began receiving troubling reports that Grace and Nolan had been misrepresenting themselves to various degrees as sole owners and founders of Out East.  Nolan was featured in one media article as the only founder.  In subsequent articles, Grace was the only founder mentioned.  Valeda considered these reports to be highly unusual and simply untrue.

40.      Grace's and Nolan's misrepresentations continued.  Presshook, a company hired and paid for by Out East to publish articles, began releasing content at the direction of Grace and Nolan that listed only Grace and Nolan as the owners of the Company.  By way of example:

- It was reported that Grace was suggesting to third parties that he, alone, created the Company concept, launched the Company, and wholly owned the Company;

- Based on Grace's faulty premise that he was sole owner of Out East, he began providing unauthorized discounts and promises on behalf of the Company; and

- Nolan gifted sunglasses on behalf of the Company without notifying the broader team or providing transparency, thus creating a concern that she was bolstering her personal profile with little to no benefit to the Company, as well as disrupting proper inventory control.

41.      The Company team offered Grace and Nolan a chance to explain themselves. Valeda and others reiterated Company policies and directions, insisted that Grace and Nolan acknowledge the broader team in their outward-facing activities, and repeated the earlier

instruction that they should limit their statements holding themselves out as "co-founders" of Out East to social applications and limited social settings, given that they were not in fact founders of the Company.  Grace and Nolan refused to listen or cooperate with Valeda or anyone else at the Company.

42.     Also, around the same time in mid-2021, the Company implemented a policy that any sunglasses gifted would be reported to Aborn and any discounts provided would be reported to Valeda.   Both Grace and Nolan refused to comply.

43.     It was also around that time that Valeda began finding unauthorized, unexplainable expenses drawn from the Company bank account.  For example, Valeda noticed large unauthorized expenditures made by Grace, which violated the Company policy requiring prior approval for expenses over $500.  When Grace was questioned about such expenses, he offered only misleading responses and defiant behavior.

44.     As an example, in April 2021, $4,000 was charged to the Company for a car rental, which was reported to Valeda as a fraud charge by the bank.  Valeda declined the charge as an unknown and unauthorized expense.  Following the denial, Grace transferred $4,503 to himself from the Company bank account on or around May 27, 2020 to rent a car.  When Grace was questioned why he needed the Company to pay $4,000 for a car, Grace was defiant and stated that he didn't need to justify his actions or expenses.

45.     At this time, Grace's behavior at the Company began to spiral out of control.  Grace was insubordinate and resisted any control or oversight over his activities with the Company. Among other things, Grace refused to attend group meetings, making the excuse that he did not want to talk about what he was working on until it was completed.

46.     Additionally, Grace was attempting to run a sharehouse in Montauk and work as a doorman at two locations while also working for the Company.  It was discovered that Grace was taking money from the Company for his own personal expenses, including expenses relating to his sharehouse project, without any authority or justification.

47.     Specifically, on or around June 17, 2021, Grace transferred an additional $1,000 from the Company account without any explanation.  The Company began to suspect that Grace had comingled his operation of his sharehouse with Out East, along with his other activities.

48.     It was also around the same time that Grace and Nolan began damaging the Company's social media platforms, by doing such things as purchasing followers and likes against the Company's explicit direction and damaging the Company's ability to reach real potential customers from advertising dollars.  Nolan and Grace were suggesting to third parties that the Company was experiencing exponential growth and success, pointing to a large number of followers that they had purchased against Company directions.  When confronted, Grace and Nolan denied the activity, but they could not explain the unusually high numbers of Russian and Brazilian followers.  It was later discovered that Grace and Nolan had purchased activity to add followers and likes from a company named VIP Likes, without Company approval and against Company directions.

49.     It was also around that time, in or around June 2021, that Grace created a Venmo account so that he could directly instruct unwitting Out East customers to pay for sunglasses into an unauthorized account.  In several instances, Grace sold sunglasses from Company inventory, providing a discount, and charging customers through the unauthorized Venmo account. The Company received reports from individuals who said they had purchased sunglasses through this Venmo channel, but the Company had received no record of payments made.

50.     Around this time, the Company began noticing significant inventory shrinkage due to Grace's and Nolan's unauthorized activity.

51.     In July 2021, Grace and Nolan began blocking Company personnel from accessing sales and inventory information by changing access passwords.  The sales team needed this critical information in order to determine the availability of inventory for sale.  When Valeda demanded that he be provided with access to the inventory tracking system, Grace responded that he did not have to justify his actions to Valeda, that people they would have to go to him directly for information, and that he would decide if he wanted to share that information.  It was at this point that Valeda requested that Aborn become involved with these issues and see if he could reason with Grace and Nolan.  Aborn demanded that access be given.

52.     In August 2021, the Company continued noticing various inconsistencies with the Company's bank account, inventory, Venmo, and PayPal accounts.  Money was being transferred out of Company accounts.  Valeda and Aborn advised Grace and Nolan to retain counsel to discuss these discrepancies and to discuss the vesting agreements with the employment agreement that were still on the table.

53.     On or about August 5, 2021, Nolan made a statement suggesting the Company had made approximately $45,000 from sales in stores while an undetermined amount was made online from ads.  Valeda needed help reconciling those representations, as the Company had not received the funds described in her statement, so it was unclear where these funds were being deposited or received.

54.     In or around August 2021, Nolan provided Valeda with false login information for a few Company accounts, which did not work because Nolan had provided incorrect passwords. Valeda informed Nolan that the passwords did not work within the same day after she provided

them.  Aborn then made another demand for login information.  Nolan refused, and Aborn accused Nolan of insubordination.

55.     On or about September 10, 2022, Grace transferred $3,535 to himself from the Company bank account without any authority or justification.

56.     In November 2021, Grace improperly transferred an additional $750 to himself from the Company bank account, without authorization or justification.

**G.     Grace and Nolan are Terminated and Proceed to Destroy Out East**

57.     By November 2021, Grace and Nolan had undermined their relationships with the Company and its management to the point that separation in some form became necessary. Company counsel attempted to negotiate a peaceable resolution with counsel for Grace and Nolan.

58.     It was at this time, on or about November 4, 2021, that Grace and/or Nolan transferred nearly all remaining funds out of the Company's business checking account, totaling around $34,000.  They wired the money to their counsel, purportedly for holding in "escrow."  In reality, it was theft of Company property.  By taking this brazen action, Grace and/or Nolan are holding the Company financially hostage.

59.     Immediately following the unauthorized transfer from the Company bank account, the Company was left with $461 and was unable to pay its bills or meet its commitments.  The principals, employees, and some investors began paying out of their own pockets to keep the Company afloat.

60.     After various demands that Grace and Nolan return the $34,000 of stolen funds, the Company terminated Grace and Nolan for cause.  In the termination letters, demand was made that all Company property be returned, including cash, inventory, and login credentials for Company accounts.

61.     Around the same time, in November 2021, Defendants deleted all files on the Company's Google Drive, including financial records, intellectual property such as eyewear design blueprints, images and videos used on websites, raw content from photoshoots, planning and forecasting tools, proprietary customer information, and other highly sensitive business records and information.  Defendants deleted all backups of these records on the Company's cloud servers.  *See* **Exhibit 1**.

62.     Due to Grace's and Nolan's efforts to permanently delete Company files, including backups, the Company has been unable to recover the files deleted from its cloud servers.  This has caused severe damage to the Company.

63.     The content that Grace and Nolan deleted from the Company's cloud servers included highly valuable Out East property that had been paid for through substantial expenditures of Company funds.  By way of just one example, Defendants deleted images from photoshoots that Out East management had organized at significant expense to use for marketing purposes.  As a direct result of Grace's and Nolan's egregious actions, the Company has lost these (and other) valuable digital assets and cannot recover them.

64.     In November and December 2021, Grace and Nolan redirected at least 15 stores carrying Out East eyewear to send funds to non-Company bank accounts set up and controlled by Grace and/or Nolan.

65.     Around the same time, Grace and Nolan also redirected other Company partners and online platforms to send monies from sales of Company products to non-Company bank accounts set up and controlled by Grace and/or Nolan.  For example, in or around December 2021, Defendants redirected the payment account associated with the Company's online store, outeasteyewear.com, to an account set up and controlled by Grace and/or Nolan.  *See* **Exhibit 2**.

66.    In addition, in or around December 2021, Grace and Nolan locked out Company management (Jeremy Valeda, Jeffrey Aborn, and Michael Roth) from updating the Company's website and Company social media accounts, including Instagram and Facebook.

67.    Around the same time, Grace and Nolan terminated Jeremy Valeda's, Jeffrey Aborn's, and Michael Roth's @outeasteyewear.com email accounts.  As a result, Velda, Aborn, and Roth cannot receive or respond to emails relating to Company business.  They have no way of knowing whether customers, partners, or other third parties may be trying to reach them by email in connection with Company business.

68.    Grace and Nolan also continued to steal Company funds by draining any remaining monies in the Company's PayPal and Venmo accounts in or around December 2021.

69.    In addition, in or around December 2021, Valeda and Aborn became aware that the Company's online stores were being removed or deleted.

70.    Also in December 2021, Valeda noticed that inventory had been gifted to online personalities and influencers, suggesting that Defendants were continuing to distribute the Company's inventory for their own purposes, without authorization, after they had been terminated.

71.    As a result of Grace's and Nolan's theft and destruction of Company property, Members of the Company's sales team stated to management that they could not earn their commissions because they did not have inventory to sell and would need to pursue other ventures.

72.    In January 2022, Valeda, Aborn, and others became aware that the Company's inventory was being sold online, without Company authorization, on at least the following platforms: (i) Facebook, under the name Hamptons Attire; (ii) Facebook, under Out East Eyewear;

(iii) Hermoza; and (iv) Wyld Blue Aspen.  *See* **Exhibit 3.**  On information and belief, all of this unauthorized activity was done by Grace and Nolan.

73.     On information and belief, Grace and Nolan continued to operate without Company authorization through approximately January 2022.  At that time, having gutted the company of its cash, intellectual property, and eyewear inventory, Grace and Nolan wound down their unauthorized operations.  Essentially, Grace and Nolan ransacked the Company, leaving it with nothing.

74.     Since January 2022, the Company has been working on raising additional funds from its principals, employees, and investors to commence this litigation.

## COUNT ONE
### (Computer Fraud and Abuse Act)
### (18 U.S.C. § 1030)

75.     Plaintiff repeats and realleges the allegations contained in all of the preceding paragraphs as if fully set forth herein.

76.     As set forth above in detail, Defendants accessed the Company's cloud server without authorization or, in the alternative, exceeding their authorized access.

77.     The Company's cloud server is a protected computer within the confines of the Computer Fraud and Abuse Act.

78.     Defendants purposely, knowingly, and intentionally destroyed all of the Company's files from the cloud server, which files contained business records, private consumer information, propriety and confidential information, and trade secrets.

79.     Upon information and belief, Defendants may have downloaded a program on the Company's cloud server to destroy all Company information.

80.     As a direct and proximate cause of Defendants' egregious actions, Plaintiff has suffered and continues to suffer millions of dollars in damage (certainly in excess of the $5,000 threshold set forth in the Computer Fraud and Abuse Act), with a precise amount to be determined at trial.

81.     Additionally, as a result of Defendants' egregious acts, Plaintiff should be awarded punitive damages, and Defendants should be immediately compelled to return all property taken from the Company.

## COUNT TWO
### (Breach of Fiduciary Duty)

82.     Plaintiff repeats and realleges the allegations contained in all of the preceding paragraphs as if fully set forth herein.

83.     Defendants, in their capacity as employees of the Company, were fiduciaries of the Company.

84.     As set forth in detail above, Defendants' egregious misconduct demonstrated that Defendants had only their own interests in mind and certainly not the interests of the Company.

85.     Defendants stole property (including cash, intellectual property, inventory, trade secrets, and confidential and proprietary information) of the Company, diverted funds for their personal use, and acted in complete contravention of the duties of care and loyalty that they owed to the Company.

86.     As a direct and proximate cause of Defendants' egregious actions, Plaintiff has suffered and continues to suffer millions of dollars in damage, with a precise amount to be determined at trial.

87.     Additionally, as a result of Defendants' egregious acts, Plaintiff should be awarded punitive damages, and Defendants should be immediately compelled to return all property taken from the Company.

## COUNT THREE
(Conversion)

88.     Plaintiff repeats and realleges the allegations contained in all of the preceding paragraphs as if fully set forth herein.

89.     The Company is the rightful owner of all of the property unlawfully taken by Defendants, including but not limited to cash, intellectual property, inventory, trade secrets, and confidential and proprietary information.

90.     Defendants had no right to take property belonging to the Company.

91.     Defendants now have control of the property that it unlawfully took from the Company.

92.     Plaintiff's rights to its own property have been compromised as a result of the Defendants' unlawful taking of such property.

93.     As a direct and proximate cause of Defendants' egregious actions, Plaintiff has suffered and continues to suffer millions of dollars in damage, with a precise amount to be determined at trial.

94.     Additionally, as a result of Defendants' egregious acts, Plaintiff should be awarded punitive damages, and Defendants should be immediately compelled to return all property taken from the Company.

## COUNT FOUR
(Doctrine of Faithless Servant)

95.    Plaintiff repeats and realleges the allegations contained in all of the preceding paragraphs as if fully set forth herein.

96.    As set forth herein, Defendants' egregious actions violated their fiduciary duties owing to the Company.

97.    As set forth herein, Defendants, among other egregious acts, destroyed Company files, stole cash in the Company's bank account and online payment accounts, stole Company inventory, and highjacked the Company's social media accounts.

98.    As a direct and proximate cause of Defendants' egregious actions, the Company has suffered millions of dollars in damage, with a precise amount to be determined at trial.

99.    As a result of Defendants' egregious conduct, Defendants should be disgorged of any and all forms of compensation received from Plaintiff and any monies taken unlawfully by Defendants during the term of their employment with the Company.

100.    Additionally, as a result of Defendants' egregious acts, Plaintiff should be awarded punitive damages, and Defendants should be immediately compelled to return all property taken from the Company.

## COUNT FIVE
(Unjust Enrichment)

101.    Plaintiff repeats and realleges the allegations contained in all of the preceding paragraphs as if fully set forth herein.

102.    During the course of Defendants' employment with the Company, Defendants received compensation from the Company.

103.     During the Course of Defendants' employment with the Company and thereafter, Defendants took monies out of Company accounts or otherwise diverted funds from such accounts and took eyewear inventory from the Company for the benefit of Defendants.

104.     All of this was to the detriment of the Company.

105.     Permitting Defendants to retain any of such monies, eyewear inventory, or funds received through unauthorized sales of inventory, would be unjust and against equity and good conscience.

106.     Accordingly, such amounts (a precise amount to be determined at trial) should be disgorged.

107.     Additionally, as a result of Defendants' egregious acts, Plaintiff should be awarded punitive damages, and Defendants should be immediately compelled to return all property taken from the Company.

## JURY DEMAND

108.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury in this action.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request the following:

(i)     Judgment under Count One in favor of Plaintiff and an award of damages against Defendants in an amount to be proven at trial;

(ii)     Judgment under Count Two in favor of Plaintiff and an award of damages against Defendants in an amount to be proven at trial;

(iii)     Judgment under Count Three in favor of Plaintiff and an award of damages against Defendants in an amount to be proven at trial;

(iv)     Judgment under Count Four in favor of Plaintiff and an award of damages against Defendants in an amount to be proven at trial;

(v)      Judgment under Count Five in favor of Plaintiff and an award of damages against Defendants in an amount to be proven at trial;

(vi)     Punitive Damages;

(vii)    Pre- and post-judgment interest to the extent permitted by law;

(viii)   Plaintiff's reasonable costs, attorneys' fees, and disbursements in enforcing its rights in this action to the extent permitted by law; and

(ix)     Such other and further relief as this Court may deem just and proper.

Respectfully,

Dated: April 14, 2022
        New York, NY

**A.Y. STRAUSS LLC**

By:     *S/ Jordan M. Engelhardt*
        Jordan M. Engelhardt, Esq.
        Eric H. Horn, Esq.
        535 Fifth Avenue, 4th Floor
        New York, New York 10017
        Tel. (646) 374-0255
        Fax (973) 840-2123
        jengelhardt@aystrauss.com
        ehorn@aystrauss.com

        *Attorneys for Plaintiff Out East
        Accessories Inc.*